UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

BARBARA J. JACKSON,

                                        Plaintiff

                                                                    DECISION AND ORDER

-vs-

                                                                    06-CV-6372 CJS

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                                        Defendant.

_____

APPEARANCES

For the Plaintiff:              Alecia A. Elston, Esq.
                                Segar & Sciortino
                                400 Meridian Centre, Suite 320
                                Rochester, New York 14618

For the Defendant:              Terrance P. Flynn, Esq.
                                United States Attorney for the
                                Western District of New York
                                Christopher V. Taffe, Esq.
                                Assistant United States Attorney
                                100 State Street
                                Rochester, New York 14614

INTRODUCTION

        This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner"), which denied

plaintiff's application for disability insurance benefits and supplemental security income

("SSI") benefits.  Now before the Court is defendant's motion for judgment on the

pleadings [#5] and plaintiff's cross-motion [#6] for the same relief.  For the reasons

stated below, defendant's motion is denied, plaintiff's motion is granted, and this matter

is remanded for further administrative proceedings.

1

PROCEDURAL HISTORY

Plaintiff applied for disability benefits on or about March 21, 2003, claiming to be disabled due to carpal tunnel syndrome, panic attacks, and depression. (102)[1].  Plaintiff indicated that she became unable to work on February 27, 2003. (102).  Plaintiff previously worked as an assembler in various factories, though she usually did not remain at any particular job for more than a few months. (103).  The Commissioner denied the application, finding that plaintiff was capable of performing light work. (83).  A hearing was held before an Administrative Law Judge ("ALJ") on October 12, 2005, after which the ALJ denied benefits. (29-66).  Plaintiff appealed to the Appeals Council (9-13), however, on May 31, 2006, the Appeals Council declined to review the ALJ's determination. (6).

MEDICAL EVIDENCE

Carpal Tunnel Syndrome

In December 2002 EMG studies showed that plaintiff had "mild bilateral median neuropathy at the wrists (eg carpal tunnel syndrome)." (140).

On January 28, 2003, F.A. Gbadamosi, M.D. completed an  "employability assessment" for the New York State Office of Temporary and Disability Assistance. (Ex. 11F, 236-237).  Gbadamosi indicated that plaintiff would be able to work, although she was "moderately" limited with regard to lifting, carrying, and using her hands. (236-237).

Non-treating physician Peter Haritatos, M.D. ("Haritatos") performed an independent medical exam on May 8, 2003. (193-197).  Plaintiff indicated to Haritatos

---

[1]Citations are to the administrative record unless otherwise noted.

that she had stopped working "because of . . . discomfort in her hands." (193).  In that regard, she stated that she was able to hold objects, but would have pain in her hands if she held them too long. (Id.).  She further indicated that her hypertension was well-controlled with medication.  She reported that she cooked meals twice per week, cleaned her house once a week, and did laundry and grocery shopping once a month. (194).  She also reported taking the following medications: Prempro, Pravachol, Prevacid, Aspirin, Norvasc, Zyrtec, Neurontin, Naproxen, Hydroxyzine, and Celexa. (194).  Haritatos' physical examination of plaintiff was essentially normal, and he noted that she had full range of motion in her elbows, forearms, and wrists, with full strength in her upper and lower extremities. (196).  Haritatos also tested plaintiff's hands for fine motor activity, and noted that her dexterity was normal with regard to tying knots, buttoning buttons, zipping zippers, and picking up a penny from a flat surface.  He further reported that plaintiff had a positive Phalen sign on the left side only, with normal grip strength bilaterally. (196).  Haritatos' prognosis for plaintiff's carpal tunnel syndrome was "guarded because the claimant has more complaints that [sic] [probably "than"] can be justified on physical [exam]," and he indicated that plaintiff "should be somewhat restricted from doing heavy lifting, pushing, pulling, and repetitive motion type of movements." (197).

On June 2, 2003, J. Cumbo ("Cumbo"), a non-treating non-examining agency medical consultant completed a physical residual functional capacity assessment. (216-221).  Cumbo's title and qualifications are not indicated on the report.  Cumbo indicated that plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, and stand, walk, and/or sit for up to six hours in an 8-hour workday. (217).  Cumbo indicated that plaintiff

had a "limited" ability to push, pull, and finger. (217-218) ("Due to wrist neuropathy,
restrict rapid, repetitive hand motions.").

On June 3, 2005, Dr. Gbadamosi completed another "employability assessment"
for the New York State Office of Temporary and Disability Assistance. (Ex. 11F, 238-
239).  Gbadamosi indicated that he had last examined plaintiff on March 10, 2005, and
that plaintiff was "moderately" limited with regard to sitting, lifting, carrying, using hands,
maintaining attention/concentration, and interacting appropriately with others. (238).
Gbadamosi stated that plaintiff could not work at any job "for at least around 6-12
months."

Depression and Anxiety

In April 2003 plaintiff began receiving treatment at the Jordan Health Center for
panic attacks.  Plaintiff was diagnosed with recurrent major depression and anxiety
disorder. (160).  Plaintiff reported that during the past three years she had experienced
increased sadness, self-doubt, anxiety, and periodic panic attacks. (166).  She reported
being depressed "most of her life," and indicated that her depression had worsened
after her father died in 1989. (175).  Plaintiff also reported anger, sleep and appetite
disturbance, difficulty concentrating, and anxiety.  She described her "panic attacks" as
consisting of "dizziness, faintness, nausea, shakiness, heart palp[itations], and difficulty
breathing." (175).  Plaintiff apparently attributed much of her sadness to her family life,
noting that she had only felt close to her father, who physically abused her, and that
she was estranged from most of her family, including her adult children. (176).  Plaintiff
indicated that she stopped working "due to problems with her hands." (175).  Therapist
Thomas McDonald ("McDonald") reported that plaintiff was well groomed, her behavior

4

was cooperative, and her thought process was logical with no evidence of delusional or psychotic processing, though her mood was "sad, anxious, [and] tearful." (168). McDonald also stated that plaintiff "appears to be adequately completing daily living skills and caring for [her] 12 year old son." (167).  Psychiatrist Lisa Slimmer, M.D. ("Slimmer") described plaintiff as "[a] 49 [year-old] female with a history of depression, anxiety, and panic related to past family issues and the loss of her father, as well as some vague psychotic-like symptoms." (178).

On May 8, 2003, non-treating psychologist John Thomassen, Ph.D. ("Thomassen") completed a psychiatric evaluation. (189-192).  Plaintiff indicated that she had driven herself to the appointment. (189).  Plaintiff reported that she was not working "because of hand problems, high blood pressure, and dizziness." (189).  She stated that between 2002 and 2003 she had made "a few emergency room visits for panic[ attacks]." (189).  She stated that she had a panic attack on April 27, 2003, in which "she was breathing excessively, had an accelerated heart rate, was shaking, and cold for 3 days." (190).  Plaintiff told Thomassen that she was often sad, angry, distracted, and forgetful. (190).  Upon examination, Thomassen observed that plaintiff's thought process was "coherent and goal directed with no evidence of thought disorder," her attention and concentration were "mostly intact."  He indicated, however, that plaintiff's mood was "slightly dysphoric," her short-term memory was "impaired," and her insight and judgment were "questionable." (191).  Thomassen's impression was "generalized anxiety disorder/dysthymic disorder," with a "somewhat guarded" prognosis.  Thomassen stated, though, that plaintiff "should be able to perform rote tasks and follow simple directions, but may have some difficulties doing complex tasks.

5

She is likely to have problems relating with coworkers and coping with stress." (191).

On May 15, 2003, George Burnett ("Burnett") completed a Psychiatric Review Technique form and mental residual functional capacity assessment.  Although defendant refers to Burnett as "Dr. Burnett," his title and medical qualifications are unclear from the reports. (Exs. 6F and 7F).  In any event, Burnett is a non-treating, non-examining agency source.  Burnett indicated that plaintiff suffers from anxiety and affective disorders which cause her to have mild limitations in her activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace. (212).

In February 2005, after apparently not having received psychiatric treatment since 2003 (240-241), plaintiff was referred for additional mental health treatment by her primary care physician, Dr. Gbadamosi. (241).  In that regard, plaintiff was complaining of panic attacks, consisting of "shortness of breath, heart palpitations, dizziness, a feeling of passing out and numbness." (241).  Plaintiff also indicated that she was having trouble sleeping, and that she felt paranoid and worried that people were watching her, and she stated that she had some obsessive-compulsive symptoms, such as frequently checking on her son and checking door locks. (241).  Plaintiff also reported feeling sad and anxious most of the time, and having panic attacks "all of the time." (242).  On examination, Kevin McIntyre, M.D. ("McIntyre"), to whom plaintiff was referred, observed that plaintiff was fully oriented, and that her appearance and behavior, speech, and motor activity were normal.  However, he noted that her mood was depressed and her affect was "constricted" and "near tearfulness" "particularly when discussing her father." (244-245).  McIntyre recommended that

6

plaintiff take Celexa for anxiety and Trazodone for sleep, and that she participate in group therapy. (248).

On April 6, 2005, Rekha Shrivastava MS CRC/Primary Therapist III ("Shrivastava") observed that plaintiff was cooperative and happy "with no evidence of any formal thought disorder." (250).  On April 20, 2005, plaintiff told Shrivastava that she was having poor sleep due to obsessive compulsive behaviors. (251).  On April 27, 2005, plaintiff told Shrivastava that prescribed deep breathing techniques were "help[ing] her a lot." (252).  On May 11, 2005, Shrivastava reported that plaintiff felt that group therapy was helping her "anxiety and self-defeating thought patterns." Shrivastava commented that plaintiff seemed "to be dealing with her anxiety effectively." (256).

On May 17, 2005, McIntyre noted that plaintiff was still having depression and anxiety, although the former was more prominent than the latter. (256).  Plaintiff reported having better sleep with Trazodone, but indicated that she was still waking up during the night.  McIntyre recommended discontinuing Celexa, since it was apparently causing plaintiff to have disturbing dreams, and recommended that she take Effexor instead. (256).

On July 27, 2005, McIntyre examined plaintiff again, at which time plaintiff reported that she was "doing ok," but still felt depressed and anxious. (262).  McIntyre indicated that plaintiff's mood was depressed, and her affect was "fair" with "some smiling and some crying, odd at times."  He stated that her thought process was "linear although at times is vague." (262).  McIntyre recommended increasing plaintiff's dosage of Effexor and that she continue with therapy. (262).  On August 8, 2005, Shrivastava

noted that plaintiff was "still depressed about the loss of her father," but "seems to be doing well as far as handling the panic attacks." (262).  However, subsequently, on August 19, 2005, Shrivastava noted that plaintiff had not shown up for a session, because she was "having a major panic attack." (263).

On August 29, 2005, McIntyre examined plaintiff and found her somewhat improved, noting that her mood was "fair" and her affect "full range." (265).  Plaintiff told McIntyre that the Effexor and Trazodone were helpful. (265).

## STANDARDS OF LAW

_____42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."  The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard."  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

The SSA has promulgated administrative regulations for determining when a claimant meets this definition.  First, the SSA considers whether the claimant is currently engaged in substantial gainful employment.  If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities.  If the claimant does suffer such an

impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations.  If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled.  If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work.  Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted).  At step five of the five-step analysis above, the Commissioner may carry his burden by resorting to the Medical Vocational Guidelines or "grids" found at 20 C.F.R. Pt. 404, Subpart P, Appendix 2. *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996)(citation omitted); *see also*, SSR 83-10 (Noting that in the grids, "the only impairment-caused limitations considered in each rule are exertional limitations.")  However, if a claimant has non-exertional impairments which "significantly limit the range of work permitted by his exertional limitations," then the Commissioner cannot rely upon the grids, and instead "must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain or perform."[2] *Pratts v. Chater*, 94 F.3d at 39; *see also*, 20 C.F.R. § 416.969a(d).[3]

---

[2]"Exertional limitations" are those which affect an applicant's ability to meet the strength demands of jobs, such as sitting, standing, walking, lifting, carrying, pushing, and pulling.  "Non-exertional limitations" are those which affect an applicant's ability to meet job demands other than strength demands, such as anxiety, depression, inability to concentrate, inability to understand, inability to remember, inability to tolerate dust or fumes, as well as manipulative or postural limitations, such as the inability to reach, handle, stoop, climb, crawl, or crouch. 20 C.F.R. 416.969a.

[3]20 C.F.R. § 416.927(d) provides, in relevant part, that, "[w]hen the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength [exertional] and demands of jobs other than the strength demands [nonexertional], we consider that you have a combination of exertional and nonexertional limitations or restrictions. . . . [W]e will not directly apply the rules in appendix 2 [the grids] unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rule provides a framework to guide our decision."

Under the regulations, a treating physician's opinion is entitled to controlling weight, provided that it is well-supported in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(d)(2); 20 C.F.R. § 404.1527(d)(2).  However, "[w]hen other substantial evidence in the record conflicts with the treating physician's opinion . . .  that opinion will not be deemed controlling.   And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)(*citing* 20 C.F.R. § 404.1527(d)(4)).

Administrative Law Judges are required to evaluate a claimant's credibility concerning pain according to the factors set forth in 20 C.F.R. § 404.1529, which states in relevant part:

> In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  By objective medical evidence, we mean medical signs and laboratory findings as defined in § 404.1528 (b) and (c). By other evidence, we mean the kinds of evidence described in §§ 404.1512(b) (2) through (6) and 404.1513(b) (1), (4), and (5) and (e). These include statements or reports from you, your treating or examining physician or psychologist, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work.
> ***
> In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about

how your symptoms affect you. (Section 404.1527 explains how we consider opinions of your treating source and other medical opinions on the existence and severity of your symptoms, such as pain.) We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. § 404.1529(a).  The regulation further states, in relevant part:

Factors relevant to your symptoms, such as pain, which we will consider include:

(i) Your daily activities;
(ii) The location, duration, frequency, and intensity of your pain or other symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

## THE ALJ'S DECISION

At the hearing before the ALJ, plaintiff testified that she was 52 years old and had completed the 11th grade. (35, 53).  She indicated that she was single and lived with her son, age 15. (37).  She stated that she had pain in her hands, wrists, and arms, and that her hands felt "big like they're swollen and they constantly hurt all the time." (38).  Plaintiff stated that because of her hand pain, she could not lift more than her purse. (40).  She stated that she has agoraphobia, and that she stays home "all the time" because she has "a fear of going in the world." (40).  Plaintiff also stated that she had difficulty standing, and could only stand for 20 minutes at a time. (56).  As far as side

11

effects of her medicines, plaintiff testified that they made her feel dizzy, and that her anti-anxiety medicine made her hair fall out. (41).  She indicated that she experienced "two or three" panic attacks per month, each of which might last for an hour. (45-46). She further stated that she does not sleep well, and wakes up every two hours. (48).

Plaintiff testified that she spends her days watching television, sleeping, and concentrating on preventing further panic attacks. (46).  She denied having any friends or social activities. (46-47).  She also denied performing any housework, stating, "My son does that." (47).  Moreover, plaintiff testified that she does not drive because she does not have a car, and because her hands hurt. (39).

Following plaintiff's testimony, the ALJ took testimony from a vocational expert ("VE") concerning step five of the sequential analysis and plaintiff's ability to perform other work.  In that regard, the ALJ posed a hypothetical question, in which he asked the VE to assume a person "49 years of age on her onset," with an 11th grade education, right handed, suffering from depression and carpal tunnel syndrome, panic attacks two to three times per month, occasional numbness in her hands, and mild agoraphobia. The ALJ additionally asked the VE to assume that the hypothetical claimant needed a job classified as light work, that would allow her to change from sitting to standing every 30 minutes, with low stress, requiring low concentration, with little or no repetitive hand movement. (61-62).  The VE responded that such a person could perform two jobs that exist in the national economy, namely, Information Clerk, DOT Code 237.367-018, and Office Helper, DOT Code 239.567-010. (62-63).  On cross-examination, plaintiff's attorney asked the VE to consider that the hypothetical claimant would be unable to attend work four days a month, to which the VE responded that an employer would likely

12

not continue to employ such a person. (64)  Plaintiff's counsel also asked the VE to

consider that the claimant would be unable to concentrate on her work approximately

one-third of the workday, to which the VE again responded that an employer would likely

fire such a person. (66).

As already, mentioned, the ALJ subsequently issued a decision denying benefits.

At the first step of the five-step sequential analysis described above, the ALJ found that

plaintiff was not engaged in substantial gainful employment. (21).  At the second step of

the analysis, the ALJ found that plaintiff had the following severe impairments: "mild

bilateral carpal tunnel syndrome" and "depression." (21-22).  At the third step of the

sequential analysis, the ALJ found that plaintiff's "severe impairments" did not meet or

equal the criteria of any impairment(s) listed in Appendix 1 of 20 C.F.R. Part 404,

Subpart P ("the Listings")(20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d),

416.925, and 416.926). (22-23).  In making this determination, the ALJ found that

plaintiff had "only mild restrictions of daily living." (23).  The ALJ found, in that regard,

that plaintiff was able to meet her son after school, prepare meals, do laundry, clean the

house, drive a car, and take care of her personal needs. (23).  He also found that

plaintiff went to therapy sessions regularly, went to church once a month, and socialized

with her cousin.  In making this finding, the ALJ apparently disregarded much of

plaintiff's hearing testimony regarding her abilities to perform activities of daily living,

which contradicted statements that she had previously made to the various medical

providers concerning her daily activities, as discussed above. (23).

At the fourth step of the analysis, the ALJ made the following RFC determination:

[T]he claimant has the residual functional capacity to perform a significant

range of light work.  She is limited to low stress work that has a sit-stand
option and requires only low concentration and memory, little or no
repetitive movement of her hands, no overhead reaching, and little
interaction with the public or supervisors.  She must avoid exposure to
temperature and humidity extremes, heights, and moving machinery.

(24).  The ALJ stated that, in reaching this conclusion, he had considered all of plaintiff's

symptoms "in accordance with the requirements of 20 CFR § 404.1529; SSRs 96-4p

and 96-7p," and that he had "considered opinion evidence in accordance with the

requirements of 20 CFR § 404.1527; SSRs 96-2p, 96-5p and 96-6p." (24).  The ALJ

indicated that plaintiff's statements regarding her limitations were "not entirely credible in

light of the reports of the treating and examining practitioners and the findings made on

examination." (24).  For example, he credited the opinions of Slimmer, McDonald, and

McIntyre, which generally indicated that plaintiff's thought processes were logical. (24).

The ALJ also credited the opinions of Cumbo (Ex. 8F) and Burnett (Ex. 7F), both non-

treating, non-examining sources, finding them to be well-supported and consistent with

the other medical evidence. (25-26).  The ALJ also noted that plaintiff had not always

followed up on treatment (24) ("[T]here is no evidence of specialized treatment for her

depression from April, 2003 through April of 2005."), and that her descriptions of her

daily activities (apart from those at the hearing) showed that she was not disabled to the

extent claimed.  Based upon this RFC, the ALJ concluded that plaintiff could not perform

her past relevant work.

However, the ALJ concluded, at the fifth step of the sequential analysis, that

plaintiff could perform the two jobs identified by the VE.  Consequently, the ALJ

concluded that plaintiff was not disabled.

14

ANALYSIS

Plaintiff contends that the ALJ erred in three general respects.  First, she
maintains that the ALJ failed to give proper weight to the opinions of treating physicians,
while giving undue weight to non-treating medical sources.  Second, she alleges that the
ALJ failed to properly evaluate her credibility.  And third, she contends that the
hypothetical posed by the ALJ to the VE was incomplete, and that, in any event, the
testimony of the VE does not support the conclusion reached, since plaintiff cannot
perform the jobs which the VE identified.

With regard to the ALJ's treatment of medical opinions, plaintiff contends that it
was error for the ALJ to give significant weight to Cumbo's opinion, Exhibit 8F, and to
give it more weight than the opinions of plaintiff's treating sources.  Specifically, plaintiff
contends that the ALJ gave Cumbo's opinion more weight than the opinions contained in
Exhibits 2F, 11F, and 13F.  However, Cumbo's opinion appears to be consistent with
those exhibits.  During oral argument, plaintiff's counsel indicated that Cumbo's opinion
was deficient because it failed to recognize any hand or manipulative limitations.
However, as already discussed above, that is incorrect.  Cumbo indicated that plaintiff
was limited in her ability to handle, perform repetitive hand motions, and push/pull. (217-
218).  Cumbo also found that plaintiff was limited in her ability to sit and lift.  Similarly,
although plaintiff contends that it was error for the ALJ to give weight to the opinions of
Burnett and Thomassen, Exhibits 6F, 7F, and 4F, she has not explained how they were
inconsistent with the opinions of her treating sources or how she was prejudiced.  For
example, Burnett found that plaintiff was moderately limited in her ability to maintain
concentration and attention for extended periods and to carry out detailed instructions.

15

He also found that she was moderately limited in sustained concentration and persistence and ability to interact with supervisors. (198-199). Similarly, Thomassen indicated that plaintiff's attention and concentration were "mostly intact," her mood was "slightly dysphoric," her short-term memory was "impaired," and her insight and judgment were "questionable." (191). Thomassen also stated that plaintiff could have difficulties doing complex tasks and that she was likely to have problems relating to coworkers and coping with stress. (191). The Court finds that the ALJ did not give improper weight to these sources, since they were essentially consistent with the opinions of her plaintiff's treating physicians.[4]

Additionally, plaintiff contends that the ALJ erred by failing to give controlling weight to the opinion of Dr. Gbadamosi that plaintiff could "not perform any job for at least around 6-12 months." However, the Court disagrees, since it is well settled that the ultimate issue of disability is reserved for the Commissioner. *See*, 20 C.F.R. § 404.1527(e)(1); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir.1999). Otherwise, the Court believes that the ALJ properly credited Gbadamosi's opinions. (*See*, 25) (ALJ assigned "considerable weight" to Gbadamosi's opinions that plaintiff had "moderate limitations in her ability to sit, lift, carry, use hands, maintain attention and concentration, and interact appropriately with others.").

Plaintiff also indicates that she would not be able to perform either of the two jobs

---

[4]As discussed below, the Court is remanding this matter for further administrative proceedings because the parties agree that the ALJ's credibility determination was insufficient. During oral argument, the Court noted that plaintiff's treating psychologist and psychiatrist had not provided any opinions specifically addressing plaintiff's ability to function in a work setting. On remand, plaintiff should be permitted to supplement the record in this regard, if she chooses to do so.

identified by the VE, based upon the General Education Development (GED) listings[5] for those positions.  Specifically, the job of Information Clerk, 237.367-022 is a sedentary-work job with a GED rating of R4 M2 L3[6], while the job of Office Helper, 239.567-010 is a light-work job with a GED rating of R2 M2 L2.[7]  Plaintiff's counsel does not explain why

---

[5]"General Educational Development [GED] embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance.  This is education of a general nature which does not have a recognized, fairly specific occupational objective.  Ordinarily, such education is obtained in elementary school, high school, or college. However, it may be obtained from experience and self-study.  The GED scale is compose of three divisions: Reasoning Development, Mathematical Development, and Language Development." Dictionary of Occupational Titles, Appendix C.

[6]04 Level Reasoning Development
Apply principles of rational systems to solve practical problems and deal with a variety of concrete variables in situations where only limited standardization exists.  Interpret a variety of instructions furnished in written, oral, diagrammatic, or schedule form.  (Examples of rational systems include: bookkeeping, internal combustion engines, electric wiring systems, house building, farm management, and navigation.)

02 Mathematical Development
Add, subtract, multiply and divide all units of measure.  Perform the four operations with like common and decimal fractions.  Compute ratio, rate, and percent.  Draw and interpret bar graphs.  Perform arithmetic operations involving all American monetary units.

03 Language Development

Reading: Read of variety of novels, magazines, atlases, and encyclopedias.  Read safety rules, instructions in the use and maintenance of shop tools and equipment, and methods and procedures in mechanical drawing and layout work.  Writing: Write reports and essays with proper format, punctuation, spelling, and grammar, using all parts of speech.  Speaking: Speak before an audience with poise, voice control, and confidence, using correct English and well-modulated voice.

Dictionary of Occupational Titles, Appendix C.

[7]02 Level Reasoning Development
Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions.  Deal with problems involving a few concrete variables in or from standardized situations.

02 Language Development

Reading: Passive vocabulary of 5,000-6,000 words.  Read at rate of 190-215 words per minute.  Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation.  Read instructions for assembling model cars and airplanes.  Writing: Write compound and complex sentences, using cursive style, proper punctuation, and employing adjectives and adverbs.  Speaking: Speak clearly and distinctly with appropriate pauses and emphasis, correct pronunciation, variations in word order, using present, perfect, and future tenses.

17

plaintiff could not perform these jobs, other than to state: "Given the record as a whole, the plaintiff would not be able to perform either of these jobs in light of the GED levels required as well as in light of the hypothetical that was given by the ALJ." (Pl. Memo of Law p.14).  Since plaintiff did not elaborate, it is unclear how she believes that she is unable to meet the GED requirements of these jobs.  Nor is it evident from the current record that plaintiff, who completed the 11th grade and has years of general life experience, such as raising children, working, handling money, and maintaining a household, would be unable to meet the GED requirements of the jobs identified by the VE.  Consequently the Court finds plaintiff's "GED" argument unpersuasive.

Plaintiff further maintains that she would be unable to perform the jobs identified by the VE because she is likely to miss three-to-four days of work per month, and is only able to maintain her concentration for two-thirds of a workday.  However, the record does not support the assumption that plaintiff would miss three or four days of work per month due to panic attacks.  Plaintiff indicated that her panic attacks, when they occur, generally last only an hour, and that she has learned strategies for controlling them. Moreover, the ALJ's hypothetical included the requirement that any job require only "low concentration." (62).

Finally, plaintiff contends that the ALJ failed to properly assess plaintiff's credibility.  In particular, plaintiff suggests that the ALJ improperly disregarded much of her testimony at the hearing, and instead relied upon other information concerning her impairments contained in the record.  As already discussed, plaintiff's hearing testimony was somewhat inconsistent with many of her prior statements to medical providers.  For example, plaintiff testified at the hearing that she stays home "all the time" because of

18

fear, that she could only lift as much as her purse weighs, and that her son performed all of the cleaning and housework, all of which is inconsistent with other evidence in the record.  Nonetheless, plaintiff contends that the ALJ did not sufficiently explain his credibility determination.  Significantly, defendant's counsel agreed, at oral argument, that the credibility determination was deficient, and that for that reason, the case must be remanded for further administrative proceedings.

CONCLUSION

Accordingly, for the reasons discussed above, defendant's motion for judgment on the pleadings [#5] is denied, plaintiff's cross-motion [#6] for the same relief is granted, and this matter is remanded for further administrative proceedings.

So Ordered.

Dated: Rochester, New York
    April 25, 2007

ENTER:


/s/ Charles J. Siragusa_____
CHARLES J. SIRAGUSA
United States District Judge